

# NUMBER 13-06-444-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

MIGUELA R. GUERRA, ET AL.,                              Appellants,

v.

CORPUS CHRISTI MEDICAL
CENTER - BAY AREA AND ITS
EMPLOYEES, MELINDA QUINONEZ,
L.V.N., ESPERANCE BISANGWA, R.N.,
AND HILLARY LOYA, R.N.,                             Appellees.

## On appeal from the 28th District Court of Nueces County, Texas.

## MEMORANDUM OPINION

### Before Justices Yañez, Rodriguez, and Benavides
### Memorandum Opinion by Justice Yañez

This is an appeal from the granting of judgment notwithstanding the verdict (JNOV)

in favor of appellee/defendant, Corpus Christi Medical Center – Bay Area ("the hospital")

and its nurse employees,[1] after a jury awarded approximately $2.2 million dollars to appellants/plaintiffs[2] in a medical malpractice case.[3] Appellants sued the hospital for medical malpractice, alleging negligence resulting in the death of Harold Guerra. Although the jury found in appellants' favor, the trial court granted the hospital's motion for JNOV and entered a take-nothing judgment. In a single issue, appellants contend the trial court erred in granting the JNOV because more than a scintilla of evidence supports the jury's verdict. Because we conclude the trial court erred in granting a JNOV, we reverse the granting of the JNOV and remand to the trial court for entry of judgment in accordance with the jury's verdict.

## I. Background

On January 27, 2003, John Halcomb, M.D., an orthopaedic surgeon, performed cervical fusion surgery on Harold Guerra. Following the surgery, Dr. Halcomb saw Guerra in the recovery room; Guerra was not having any breathing difficulties.[4] Around 2:20 p.m., Guerra was discharged from the recovery room and was moved to a hospital room, where he was under the care of Melinda Quinonez, LVN. At trial, Guerra's wife, Miguela ("Mickie"), testified that around 2:30 p.m., she called the nurse and reported that Guerra

---

[1] It is undisputed that the jury was properly instructed that the hospital included its nurses and that it could act only by and through its nurses in the course and scope of their employment. Thus, we refer to the hospital and its nurse employees as "the hospital" and "appellee."

[2] Appellants are Miguela Guerra, individually and as next friend of LMG, a minor child, and as representative of the Estate of Harold J. Guerra, deceased, Richard Guerra, Mark A. Guerra, Harold J. Guerra Jr., Alma Guerra, and Hortensia Guerra, mother of Harold Guerra (deceased), and Frank Guerra. Appellants are the surviving spouse, children, and mother of the deceased, Harold J. Guerra.

[3] See TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.001-.507 (Vernon 2005 & Supp. 2008).

[4] Trial testimony established that patients, like Guerra, who have had surgery in the airway area are at high risk of developing post-operative breathing complications due to compression of the airway from bleeding.

2

felt anxious, was having trouble breathing, and did not feel right.[5] Nurse Quinonez changed Guerra's neck dressing and left. According to Mickie, over the next hour and fifteen minutes, she reported to the nursing staff three more times that Guerra continued to experience breathing difficulties and did not feel right.

At trial, there was conflicting testimony as to when Guerra first complained that he was having trouble breathing. Nurse Quinonez testified that around 2:30 p.m., Guerra reported feeling anxious, but that neither Guerra nor his family complained that he was having breathing difficulties or shortness of breath until 3:25 p.m. Mickie testified that around 3:20 or 3:25 p.m., she pressed the "call button" and again reported that Guerra was still having trouble breathing. There was no immediate response. She called for a nurse a second time and asked for help. At 3:40 p.m., Hillary Loya, RN, responded and checked Guerra's oxygen level. Esperance Bisangwa, the charge nurse for the floor, was also present. By this time, Guerra was gasping for air and losing consciousness. By 3:45 p.m., he was in acute respiratory distress and a respiratory "code" was called. Dr. Halcomb was called at home at 3:45 p.m.; he arrived at the hospital at 4:05 p.m. During the code, several doctors, including an anesthesiologist and an emergency room physician, tried unsuccessfully to intubate Guerra. Around 4:05 p.m., an emergency tracheostomy was performed. By that time, however, Guerra had been deprived of oxygen for such a long time that he was "brain dead." Guerra died eleven days later after life support was terminated.

## II. Standard of Review and Applicable Law

---

[5] This was Guerra's second time for the surgery, and he complained that he did not "feel right."

3

The trial court may disregard a jury's verdict and render a JNOV if no evidence supports one or more of the jury's findings or if a directed verdict would have been proper.[6] To determine whether the trial court erred in rendering a JNOV, we review the entire record, crediting favorable evidence if reasonable jurors could and disregarding contrary evidence unless reasonable jurors could not.[7]

The jury is the sole judge of witnesses' credibility, and it may choose to believe one witness over another; a reviewing court may not impose its own opinion to the contrary.[8] Jurors may disregard even uncontradicted and unimpeached testimony from disinterested witnesses.[9] "[W]henever reasonable jurors could decide what testimony to discard, a reviewing court must assume they did so in favor of their verdict, and disregard it in the course of legal sufficiency review."[10]

Circumstantial evidence may prove any material fact, so long as it transcends mere suspicion.[11] The material fact must be reasonably inferred from the known circumstances.[12] It may not be proved by unreasonable inferences from other facts and circumstances or by piling inference upon inference.[13] When claims or defenses are

---

[6] *See* TEX. R. CIV. P. 301; *Tiller v. McLure*, 121 S.W.3d 709, 713 (Tex. 2003).

[7] *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005).

[8] *Id.* at 819.

[9] *Id.* at 820.

[10] *Id.* at 820-21.

[11] *KPH Consolidation, Inc. v. Romero*, 102 S.W.3d 135, 145 (Tex. 2003).

[12] *Id.*

[13] *Id.*

4

supported by meager circumstantial evidence, the evidence is legally insufficient if jurors would have to guess whether a vital fact exists.[14]  "'When the circumstances are equally consistent with either of two facts, neither fact may be inferred.'"[15]  In such cases, the reviewing court must "view each piece of circumstantial evidence, not in isolation, but in light of all the known circumstances."[16]  "Thus, when the circumstantial evidence of a vital fact is meager, a reviewing court must consider not just favorable but all the circumstantial evidence, and competing inferences as well."[17]

"The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review."[18]  If the evidence "would enable reasonable and fair-minded people to differ in their conclusions, then jurors must be allowed to do so."[19]  We do not substitute our judgment for that of the trier-of-fact if the evidence falls within this zone of reasonable disagreement.[20]

In its motion for JNOV, the hospital argued the evidence was legally insufficient to support the causation element of appellants' negligence claim.  The order granting JNOV "set aside the jury's answer to Question 1," which asked, "[d]id the negligence, if any, of

---

[14] *City of Keller*, 168 S.W.3d at 813.

[15] *Id.* (quoting *Tubelite, a Div. of Indal, Inc. v. Risica & Sons, Inc.*, 819 S.W.2d 801, 805 (Tex. 1991)).

[16] *Id.* at 813-14 (quoting *Lozano v. Lozano*, 52 S.W.3d 141, 167 (Tex. 2001)).

[17] *Id.* at 814.

[18] *Id.* at 827.

[19] *Id.* at 822.

[20] *Id.*

Corpus Christi Medical Center—Bay Area proximately cause the death of Harold Guerra?"[21]

To establish proximate cause, the plaintiff must prove (1) foreseeability, and (2) cause-in-fact.[22] In cases involving medical negligence, cause-in-fact requires that the plaintiff prove "by a preponderance of the evidence, [that] the negligent act or omission is shown to be a substantial factor in bringing about the harm, and without which the harm would not have occurred."[23] The plaintiff must establish a causal connection between the defendant's negligence and the injuries based upon a reasonable medical probability.[24]

The trier of fact may decide the issue of proximate cause in medical malpractice cases based upon: (1) general experience and common sense from which reasonable persons can determine causation; (2) scientific principles provided by expert testimony allowing the fact finder to establish a traceable chain of causation from the condition back to the event; or (3) a probable causal relationship as articulated by expert testimony.[25] Expert testimony regarding a causal connection rests upon reasonable medical probability that must be determined by the substance and context of the testimony rather than semantics or use of a particular term or phrase.[26] An expert's opinion is without probative

---

[21] The hospital asserts that proximate cause is the only element of negligence on which its motion for JNOV was based.

[22] *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex. 1996).

[23] *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995).

[24] *Id.*

[25] *See Guevara v. Ferrer*, 247 S.W.3d 662, 667 (Tex. 2007) (citing *Lenger v. Physician's Gen. Hosp., Inc.*, 455 S.W.2d 703, 706 (Tex. 1970)).

[26] *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 500 (Tex. 1995).

value and cannot support a verdict or judgment when it is based on assumed facts that vary materially from the actual, undisputed facts.[27]

## III. Analysis

In this case, expert medical testimony based on reasonable probability was required to establish either a "traceable chain of causation" based upon general scientific principles or a "probable causal relationship" between the hospital's failure to timely notify Dr. Halcomb regarding Guerra's post-operative respiratory difficulties and Guerra's death. Specifically, appellants' burden was to establish, through expert testimony, that there was a reasonable medical probability that the hospital's failure to timely notify Dr. Halcomb was a substantial factor in bringing about Guerra's death and without which the harm would not have occurred.[28]

### A. Appellants' Evidence

With respect to causation, appellants cite the testimony of: (1) their expert witness, David J. Cullen, (2) Dr. Halcomb, (3) a second expert witness, Paul William Dlabel, M.D.,[29] (4) Quinonez, and (5) Bisangwa, an RN and the charge nurse assigned to the floor when Guerra was a patient. We examine the testimony of these witnesses in turn.

### 1. Dr. Cullen

Dr. Cullen, an expert in anesthesiology and critical care medicine, testified as follows:

Q [appellants' counsel]: If a nurse or somebody taking care of a patient

---

[27] *Id.* at 499.

[28] *See Park Place Hosp.*, 909 S.W.2d at 511.

[29] Dr. Dlabel testified by deposition.

7

postoperatively, a patient like Mr. Guerra, is confronted with a complaint of, I don't feel right, having trouble breathing, say at 2:30 in the afternoon, specifically in Mr. Guerra's case, what would you expect to occur as a result of that?

A [Dr. Cullen]: First thing I would do is expect the nurse to get an oxygen mask on the patient immediately and call the surgeon.

    . . . .

Q: If a nurse waited until [3:25 p.m.] in this kind of situation, with evidence of anxiety, trouble breathing before hand, is there any guarantee, or even probabilities [sic] that Mr. Guerra could have been saved, if you wait that long?

A: Well, if you wait that long to notify somebody, you really have taken most of the opportunity for dealing with it away because we know in retrospect that within 20 minutes he arrested. And to get people mobilized and dealing with this problem, maybe it could be done within that 20 minutes before he arrested and he could have been brought down to the operating room or something done to open up the airway, but you're running a very, very short time. And I can't tell you whether that would have been more likely than not to happen in that 20 minutes from making a phone call to getting everything done.

Q: But if the call was made at 2:30, or even as late as 2:45, what is your opinion about whether or not Mr. Guerra, in this case, could have been saved?

A: If the call had been made at that time, there would have been time for Dr. Halcomb to get in, because he took 20 minutes to get in when he did get called, there would be time for him to get in, look at the patient. There would also be time for him to call the operating room and rush the patient, if he felt this was necessary, bring the patient down to the operating room where they have proper equipment access, all the technologic support that they need to get him intubated or to help Dr. Halcomb open up the neck and try and deal with the problem that way. And there would be, you know, it would be rush, rush, but there is plenty of time for the things that needed to be done to happen if you had an hour and a quarter to an hour, let's say. And this whole thing could be done from the first call until things get taken care of, I would say probably within a half hour. If the surgeon was right upstairs in the operating room and ran down the stairs and did it, I have seen this taken care of within five minutes.

Q: And because of the time frame as you have described and knowing what

8

Dr. Halcomb's testimony—and again the facts of the case, would in all probability Mr. Guerra have at least not died as a result of this condition?

A: Well, I think not only—yes. He would not have died. He would not have gotten hypoxic. He would not have brain damage. He would have been successfully taken care of.

Q: All right. If I'm reading you right, the longer the wait, the more risk that that is not going to happen?

A: Right.

. . . .

Q [on cross-examination, by hospital's counsel]: And so you have to kind of be able to look at it both ways. One, if you listen to the family, one, if you listen to the nurses. If the shortness of breath in fact was first reported and assessed at [3:25 p.m.], then in your opinion that's when Dr. Halcomb should have been called, right?

A: Right.

. . . .

Q: All right. Now, let me ask you if you agree with this: Assuming that there had been earlier intervention in Mr. Guerra's case, if there had been earlier assessments and reporting of shortness of breath or difficulty breathing resulting in an earlier call to the physician, a change of events that didn't occur here, right?

A: Right.

Q: We can agree on that. As far as what the outcome would have been had things started earlier, the truth of the matter is, in your opinion, none of us would know what would have happened, right?

A: In a detailed sense, we would not know what happened, that's correct.

Q: Okay. Thank you. To know what would happen or try to say what would happen, I think you told us in your deposition is just speculation, right?

A: Yes.

Q: And I think you also told us in your deposition that you have no way of knowing if they would have tried to intubate Mr. Guerra earlier, you have no

9

way of knowing if they would have been able to do it, right?

A: I think I have a pretty good idea that they would have been able to do it under the right circumstances, with appropriate tools in the operating room, with appropriate paralysis and anesthesia. I think, more likely than not they would have been able to intubate. If they came up to the floor and tried the same thing on the floor, I don't think they would have—I couldn't tell you what might have happened.

Q: Doctor, do you have a copy of your deposition up there?

A: Yes.

Q: And I'm guessing since you have done this before, you probably reviewed it fairly recently. Is that fair to say?

A: I did, yes.

Q: Let me tell you why I asked that. If you can turn to Page 62 of your deposition. Actually, we are going to have to start even before that, probably—let me see if I can figure out where the—

[Counsel for hospital]: May I approach, Your Honor?

[Court]: Yes, sir.

Q [Counsel for hospital]: Doctor, let me see if I can help you get there. Right here on Page 63. Right here, line 12, that's part of your answer. It's a very long discussion that's going on but you say that he might have been intubateable earlier, on or before they got to the point where they got with him, I don't know if—and the question then is, "You just couldn't say one way or the other?" You say, "Huh?" "You just couldn't say one way or the other?" And you say on Line 19, "I can't say one way or the other if he could have been intubateable earlier," right?

A: Right. And I would ask you to continue, "All I can say is that the sooner you address it the better chance you have of dealing with it."

Q: And I'm not arguing with you on that. Your testimony at your deposition was, you don't know. You can't say one way or the other if he would have been intubateable earlier, right?

A: Right. But the context, we have to put the context of this answer in for the previous few pages. And this was in the context of, if they had notified at [3:25 p.m.], and then had that short period of time. The question you asked

10

me here was about an earlier intervention. And what I was saying, if they had known at 2:30 or 2:45, they would have had plenty of time to deal with the intervention in a very different way than they are dealing with it when they only have a few minutes, assuming that the clock starts at [3:25] with the shortness of breath.

If the shortness of breath clock starts at 2:30, at [2:30], then they have a lot more time to do a lot of things that I think the outcome would have been more likely than not, acceptable. There are two different contexts. This is in the context—if you go back to Page 60, this is in context of a question that starts on a [3:25] basis. And that's how I was answering that all through here.

Q: So when you say that he may have been, "Might have been intubateable earlier on or before he got to the point where he got, I don't know." And then you go on to say, "I can't say one way or the other."

A: That was my thinking in the context that if they had gotten somebody there, you know, by calling at [3:25] and somebody came right up and they got started. A few lines before I talked about the fact that you had an intern who couldn't possibly be expected to deal with this kind of dire emergency. So that's the context that this question was being answered in.

. . . .

Q [on re-direct, by appellants' counsel]: And have you told us what you believe would happen if this man [Guerra] had been properly assessed and doctors timely notified of the anxiety or the trouble breathing? You have told us about that.

A: Right. As I said, I think he would have had time to get assessed, if they thought, you know, they may have made a completely incorrect assessment and nothing would have changed. But the nurse would have done her job in getting somebody there who can deal with the problem. But if they made a correct assessment and got him down to the operating room or the PACU where there is equipment, where there are personnel who can deal with this, get him into a proper position, extra hands, extra help. If they can't intubate him, we have enough time—they have enough time that they can get a surgeon there to do a tracheotomy, not when he is already in cardiac arrest but well before he is in cardiac arrest, open up his trachea. It is easy to open the incision, just cut the sutures and you've got the incision open, get down to the trachea quickly and get a tube into the trachea. That's why I think I have a pretty good idea that with enough time, they would have been able to solve the problem.

11

Q: Consistent with what Dr. Halcomb has told the jury, that if he had been timely notified, this man would not have at least not died because of this condition?

A: Correct.

Q: And to evaluate your opinion one step further, if you look at what Dr. Halcomb has said and what he can and would have done, knowing his skill level, knowing the caring that he had for the patient, knowing the heroic efforts that the code team used to try to save this man, is there really any question that in all probability, with timely intervention, Mr. Guerra would not have passed at that time?  Is there any real question about that?

A: Right. If you frame the question the way you did, what you're saying, with all probability, then I think that is a very easy one.  In fact, with reasonable medical probability or all probability, however you want to say it, there would have been enough time given the attention Dr. Halcomb said he would give to the problem and get the help, and so on and so forth, do all the things we talked about, and he would have been saved.

Q: All right.

A: What you don't have starting at [3:25] is time.  You don't have time to get all that to happen.  That's why I said it was speculative.

.  .  .  .

Q [on re-cross, by hospital's counsel]: And you go on to say, "But just all it would do would give him a better chance at—"  Question, "So it would give him a better chance of surviving intact but you can't say within reasonable medical probability the earlier intervention would have—would have caused him to survive intact."  And your answer was what?

A: "Correct."

Q: Do you stand by that testimony?

A: I do if I am allowed to explain why I said that.  Am I?

Q: Doctor, I think it is pretty clear.

A: No, I don't think it is as clear as you want it to be, so I would like to be able to explain my answer.  My answer is that if—I don't know what they would have actually done. I don't know if the anesthesiologist would have done any better in the operating room or not.  I don't know if the surgeon would have

12

gotten the tracheotomy sooner. What I'm saying is that if those things that I went over two or three different times here today had happened in the way they should have happened, I think more likely than not he would survive intact.

Now some of those things might not have happened in the right way. They might have gotten stuck on the elevator, they might have gotten him down to the PACU and couldn't find the right equipment, they might not have found an anesthesiologist who was capable of intubating him, they might have gotten him on the operating room table and started opening up his incision and something would have happened. I don't know. I'm just saying, if steps that I have outlined were taken, I think he would have a very good chance of surviving intact

Q: You say, they would—these earlier things, "Would improve the chances he would survive intact this crisis. Whether it would have happened or not, I have no idea."

A: Right. How can I know what they—each of these people who needed to act, what they would have done? I don't know that. But if they did what they should be able to do, that's how I answered the question. I think it's fairly straight forward to me.

## 2. Dr. Halcomb

Dr. Halcomb's videotaped deposition testimony was presented to the jury. Dr. Halcomb noted that his physician's orders for Guerra stated that he should be called if Guerra experienced—among other things—any "respiratory distress." Dr. Halcomb testified that he received a call at home from his office staff regarding Guerra at 3:45 p.m. He returned the call immediately, and was told that a "code team" had been called for Guerra. Dr. Halcomb arrived at the hospital at 4:06 p.m. When he arrived at Guerra's bedside, he assisted Dr. Kermian, an ENT physician, in performing a tracheostomy. Dr. Halcomb testified:

Q [appellants' counsel]: Doctor, if you had been called by the nursing staff there at 2-West when mister—when it was reported by Mrs. Guerra that her husband started complaining, or complaints of shortness of breath around 2:30 that afternoon, do you have an opinion, based on reasonable medical

13

probability, as to whether or not Mr. Guerra would still be alive today?

A: I believe I do and I would have to qualify that. When you say, today, evidently he did have some significant heart problems, but I am beyond a reasonable medical probability if he would have had appropriate timely care; with appropriate protection of his airway and oxygenation, then he certainly would have not died of anoxic encephalopathy at that time. So, do I know whether he would be alive today or not? No. Do I believe that if timely intervention would have been performed, he would not have died of anoxic encephalopathy? Yes.

. . . .

A: I think that in a post operative patient, after a major surgical procedure, a registered nurse needs to take primary responsibility and assessment and not shift those responsibilities off to a lower trained personnel. It is like in the military, you can delegate authority, you can't delegate responsibility. If a well-trained, registered nurse had evaluated this patient, I am absolutely confident that the alarm would have been sounded sooner.

Dr. Halcomb also testified that he did not know why the physicians were unable to successfully intubate Guerra.

### 3. Dr. Dlabel

Paul William Dlabel, M.D., a specialist in cardiovascular disease, testified for appellants by videotaped deposition. He testified, in relevant part, as follows:

Q [appellants' counsel]: At what point in time do you believe that intervention would have saved Mr. Guerra?

A: According to the sequence of events in this clinical record, intervention sufficient to restore airway function and oxygen status prior to brain deterioration would have completely reversed this situation, or nearly so.

Q: Okay. And where—what time would that have been?

A: Well, I don't have enough information on the record to give you an exact minute because I can't tell what his oxygenation status was in the hour prior to arrest or even the 16 minutes prior to arrest. But certainly anything done before [3:45 p.m.] would have prevented the sequence of events from that time forward, and I would assume that since he was complaining of shortness of breath and difficulty breathing, he was still conscious prior to

[3:45 p.m.].

Q: What kind of intervention was needed prior to [3:45 p.m.]?

A: Apparently, airway management.

Q: But that—you cannot say within reasonable medical probability that for this particular patient that earlier intervention would have caused him to survive intact?

A: Relying upon standard medical information, patients who suffer respiratory difficulties post-operatively and were normal from a respiratory status pre-operatively have an extremely high survival rate when treated appropriately, better than 95 percent. So in all medical probability, had he been treated promptly and appropriately so as to prevent respiratory arrest, he would not have died at the time and place nor in the manner he did.

### 4. Nurse Quinonez

Nurse Quinonez testified that Guerra did not complain of shortness of breath until 3:25 p.m. She stated that if he or his family had complained that he was suffering from shortness of breath any time before 3:25 p.m., she would have asked the charge nurse to assess his status. She testified that the entries she made in Guerra's records reflect that he was experiencing unusual "anxiety" at 2:30 p.m. She admitted that she did not ask Guerra why he was feeling anxious, but believed that it was resolved because he was sleeping. She also stated that the charge nurse came in at 2:30 p.m. and checked Guerra's status. According to Nurse Quinonez, at 3:15 p.m., Guerra again complained that he felt very anxious and had a dry throat; she brought him ice chips. At 3:25 p.m., Nurse Quinonez's notes reflect that Guerra's family called the nurses' station and reported that Guerra "continues" to have pain and shortness of breath. Nonetheless, Nurse Quinonez testified that the first complaint of shortness of breath was at 3:25 p.m. Nurse Quinonez and Nurse Bisangwa went to the room. The decision was made to give Guerra

15

supplemental oxygen, but the necessary equipment had to be retrieved from the supply room. For the next twenty minutes, between 3:25 p.m. and 3:45 p.m., Nurse Quinonez did not know whether the doctor was called. Nurse Quinonez testified regarding the foreseeability of Guerra developing an occluded airway:

> Q [appellants' counsel]: If a patient such as Mr. Guerra and his family make complaints like that, that being, I'm having trouble breathing, I don't feel right, after this kind of surgery, and it is not—and that complaint is not properly assessed, per the standard of care as you and I have talked about, it is foreseeable, is it not, that one of the consequences could be an occluded airway?
>
> A: Yes.
>
>     . . . .
>
> Q: An occluded airway in a situation in which we have been discussing can lead to what, from your knowledge as an LVN?
>
> A: The patient won't get any air and he will have a respiratory code.
>
> Q: A respiratory code?
>
> A: Meaning he is not breathing and emergency procedures will have to be started.
>
> Q: And unless those emergency procedures are successful, again, from a nursing standpoint, what can occur?
>
> A: Death.
>
> Q: Coma?
>
> A: Yes.
>
> Q: Brain death and ultimately death, correct?
>
> A: Correct.
>
>     . . . .
>
> Q: From a nursing standpoint, you knew, did you not, that that [brain death]

16

is a potential foreseeable consequence?

A: Of a respiratory code? Yes.

### 5. Nurse Bisangwa

Nurse Biswanga testified that if Nurse Quinonez was told that Guerra was having trouble breathing and did not "feel right," it would have been appropriate to have a doctor assess his status. She agreed that had Nurse Quinonez done so, "we wouldn't be here today." Nurse Biswanga testified that because Guerra was very anxious, Nurse Quinonez should have called the doctor. She also stated that tragic consequences—such as the respiratory arrest and brain death suffered by Guerra—were foreseeable as a result of the failure to notify the doctor of Guerra's anxiety.

### B. The Hospital's Argument

The hospital argues that the trial court properly granted a JNOV because there is a complete absence of evidence of a vital fact—i.e., that an earlier call to the doctor and an earlier-attempted intubation of Guerra would have prevented his death. Thus, according to the hospital, "any expert opinion predicated on the assumption that Mr. Guerra would have been intubated up to an hour earlier is (a) an unsupported assumption contrary to the actual evidence, and (b) pure speculation and conjecture."[30]

The hospital also cites *City of Keller* for the proposition that "evidence that might be 'some evidence' when considered in isolation is nevertheless rendered 'no evidence' when contrary evidence shows it to be incompetent."[31] Thus, even though Dr. Cullen opined that

---

[30] BRIEF OF APPELLEE at 20, *Miguela Guerra, et al. v. Corpus Christi Med. Ctr.—Bay Area*, No. 13-06-00444-CV (Tex. App.–Corpus Christi argued Nov. 28, 2007).

[31] *See City of Keller*, 168 S.W.3d at 813.

the nurses' failure to notify Dr. Halcomb earlier was a proximate cause of Guerra's death, the hospital contends other evidence established that Dr. Cullen's opinions "were legally incompetent because (a) they were based on improper assumptions that varied from the actual, undisputed facts; (b) they were based on a series of possibilities, guesswork, and speculation; and (c) they consisted largely of Dr. Cullen's own subjective beliefs."[32]

The hospital also argues that Dr. Cullen's opinions on causation merely constitute "a series of 'ifs'," like the series of possibilities rejected by the Houston Court of Appeals in *Jea v. Cho.*[33] In *Cho*, the plaintiff (the victim of a robbery while working at a grocery store) appealed from a JNOV, arguing that he presented more than a scintilla of evidence that the defendant's negligent acts caused his injuries by failing to (1) provide him a key to lock the store from inside, (2) provide adequate exterior lighting, and (3) provide a second employee to assist during closing.[34] The Houston court held that although

> these measures might have theoretically made the store somewhat more difficult to rob, and possibly even prevented the robbery from occurring *in the manner that it did*, there is no empirical data, expert opinion, or other evidence that such measures have *actually* had any effect on preventing or reducing such crimes where they have been implemented, let alone a reasonable probability that this particular robbery or shooting would have been deterred or thwarted by using them.[35]

We disagree with the hospital's arguments. Dr. Cullen testified that "in all probability," Guerra would not have died if the nurses had called Dr. Halcomb at 2:30 p.m. or even as late as 2:45 p.m. Although on cross-examination, Dr. Cullen admitted he did

---

[32] BRIEF OF APPELLEE at 26.

[33] *See Jea v. Cho*, 183 S.W.3d 466, 469 (Tex. App.–Houston [14th Dist.] 2005, no pet.).

[34] *Id.* at 468.

[35] *Id.* at 469 (emphasis in original).

18

not know what would have happened "in a detailed sense," he stated that Guerra "more likely than not" could have been successfully intubated with all the appropriate tools available in the operating room. He further testified that if Guerra's breathing difficulties were first reported at 2:30 p.m.—as Mickie told the jury—Dr. Halcomb should have been notified and in all probability, Guerra would not have died. He conceded that if—as Nurse Quinonez claimed—Guerra's shortness of breath was not reported until 3:25 p.m., and Dr. Halcomb was called at that time, the outcome becomes more "speculative" because "[w]hat you don't have starting at [3:25 p.m.] is time." We note that the jury is the sole judge of witnesses' credibility and may choose to believe one witness over another.[36] Thus, the jury was entitled to believed that Mickie reported Guerra's anxiety and breathing difficulties at 2:30 p.m., and was entitled to reject Nurse Quinonez's testimony that Guerra's shortness of breath was not reported until 3:25 p.m. Nurse Quinonez's testimony expressly established that Guerra's death was a foreseeable consequence of the failure to address his complaints of breathing difficulties.

The hospital emphasizes that because none of the physicians could explain why attempts to intubate Guerra were unsuccessful, any assumption that an earlier call to Dr. Halcomb would have resulted in a positive outcome is "contrary to the undisputed facts, conclusory, and based on speculation and guess." According to the hospital, "[t]he record contains no direct or circumstantial evidence proving that, even if the nurses had called a doctor an hour earlier, an intubation or other airway access would have been achieved for Mr. Guerra, within a reasonable medical probability."[37] We disagree. Dr. Cullen's

---

[36] *City of Keller*, 168 S.W.3d at 819.

[37] BRIEF OF APPELLEE at 18.

19

testimony established that if Nurse Quinonez had called Dr. Halcomb at 2:30 p.m., the extra hour and fifteen minutes would have allowed Dr. Halcomb to bring Guerra to the operating room where, with proper equipment and ideal conditions, "more likely than not they would have been able to intubate."

We also disagree with the hospital's argument that Dr. Cullen's opinions are merely "a series of ifs" as in *Cho*. In *Cho*, the Houston court noted the absence of any expert opinion establishing a reasonable probability that the measures at issue would have deterred the robbery.[38] In the present case, Dr. Cullen's testimony constitutes expert opinion evidence that in all probability, Guerra would not have died if Dr. Halcomb had been called at 2:30 p.m.

## IV. Conclusion

After crediting evidence favorable to the finding that a reasonable fact-finder could, and disregarding evidence contrary to the finding unless a reasonable fact-finder could not, we conclude the evidence offered to prove causation is legally sufficient.[39] We hold that Dr. Cullen's testimony—that if Dr. Halcomb had been called at 2:30 p.m. or even 2:45 p.m., Guerra in all probability would not have died—is legally sufficient to support the jury's finding that the hospital's negligence was a proximate cause of Guerra's death.[40] The evidence does more than create a mere surmise or suspicion that the hospital's failure to timely notify Dr. Halcomb of Guerra's breathing difficulties was a substantial factor in

---

[38] *See Cho*, 183 S.W.3d at 469.

[39] *See City of Keller*, 168 S.W.3d at 827.

[40] *See Park Place Hosp.*, 909 S.W.3d at 511.

bringing about his death, and without which his death would not have occurred.[41]

Accordingly, we sustain appellants' issue, reverse the trial court's judgment notwithstanding the verdict, and remand to the trial court solely for entry of judgment in accordance with the jury's verdict.[42]

                                                             _____

                                                             LINDA REYNA YAÑEZ,
                                                             Justice

Memorandum Opinion delivered and filed
this the 20th day of November, 2008.

---

[41] *See id.*

[42] When, as here, the trial court renders a JNOV, and the losing party appeals, the prevailing party may also appeal and present points or issues on any ground that would either vitiate the verdict or preclude affirming the judgment and reinstating the jury's verdict. *Swink v. Alesi*, 999 S.W.2d 107, 111-12 (Tex. App.–Houston [14th Dist.] 1999, no pet.); *see also* TEX. R. APP. P. 38.2(b) (providing that when a trial court renders a JNOV "the appellee must bring forward by cross-point any issue or point that would have vitiated the verdict or that would have prevented an affirmance of the judgment if the trial court had rendered judgment on the verdict. Failure to bring forward by cross-point an issue or point that would vitiate the verdict or prevent an affirmance of the judgment waives that complaint."); TEX. R. CIV. P. 324(c) (stating that when a JNOV is rendered the appellee "may bring forward by cross-point contained in his brief filed in the Court of Appeals any ground which would have vitiated the verdict or would have prevented an affirmance of the judgment had one been rendered by the trial court in harmony with the verdict, including although not limited to the ground that one or more of the jury's findings have insufficient support in the evidence or are against the overwhelming preponderance of the evidence as a matter of fact. . . ."). "The purpose of these rules is to require a final disposition of the case by the appellate court, where a judgment notwithstanding the verdict is erroneously rendered by the trial court, on the basis of the record before it, and to order a remand only as to questions that require the taking of additional evidence, such as jury misconduct." *Alesi*, 999 S.W.2d at 112. Here, the hospital presented no cross-points on appeal.

We also note that although the record contains appellants' proposed "Motion for Judgment," which references appellants' proposed judgment as "Exhibit A," no "Exhibit A" is included in the record before us. Accordingly, we remand to the trial court for entry of judgment.